B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(For Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| **Miramar Brands Group, Inc.**<br>**440 South Marengo Avenue**<br>**Pasadena, CA 91101** | **Paul Shechet**<br>**1881 Country Lane**<br>**Pasadena, CA 91107** |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| **Dheeraj K. Singhal**<br>**DCDM Law Group, PC**<br>**30 No. Raymond Ave., Suite 801**<br>**Pasadena, CA 91103**<br>**(626) 689-2407 Fax: (626) 689-2205** | **Richard T. Baum**<br>**11500 West Olympic Blvd., Suite 400**<br>**Los Angeles, CA 90064-1525** |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| [X] Debtor    [ ] U.S. Trustee/Bankruptcy Admin<br>[ ] Creditor    [ ] Other<br>[ ] Trustee | [ ] Debtor    [ ] U.S. Trustee/Bankruptcy Admin<br>[X] Creditor    [ ] Other<br>[ ] Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUES INVOLVED)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF IN REGARDING TO A PRE-PETITION DERIVATIVE ACTION

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) - Recovery of Money/Property**
[ ] 11-Recovery of money/property - §542 turnover of property
[ ] 12-Recovery of money/property - §547 preference
[ ] 13-Recovery of money/property - §548 fraudulent transfer
[ ] 14-Recovery of money/property - other

**FRBP 7001(2) - Validity, Priority or Extent of Lien**
[ ] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) - Approval of Sale of Property**
[ ] 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) - Objection/Revocation of Discharge**
[ ] 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) - Revocation of Confirmation**
[ ] 51-Revocation of confirmation

**FRBP 7001(6) - Dischargeability**
[ ] 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
[ ] 62-Dischargeability - §523(a)(2), false pretenses,
    false representation, actual fraud
[ ] 67-Dischargeability - §523(a)(4), fraud as fiduciary,
    embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) - Dischargeability (continued)**
[ ] 61-Dischargeability - §523(a)(5), domestic support
[ ] 68-Dischargeability - §523(a)(6), willful and malicious injury
[ ] 63-Dischargeability - §523(a)(8), student loan
[ ] 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
[ ] 65-Dischargeability - other

**FRBP 7001(7) - Injunctive Relief**
[X] 71-Injunctive relief - imposition of stay
[ ] 72-Injunctive relief - other

**FRBP 7001(8) Subordination of Claim or Interest**
[ ] 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
[X] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
[ ] 01-Determination of removed claim or cause

**Other**
[ ] SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
[ ] 02-Other (e.g. other actions that would have been brought in state
    court if unrelated to bankruptcy case)

| [ ] Check if this case involves a substantive issue of state law | [ ] Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| [ ] Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>**Miramar Brands Group, Inc.** | BANKRUPTCY CASE NO.<br>**2:13-bk-25682-ER** | |
| DISTRICT IN WHICH CASE IS PENDING<br>**Central District of California** | DIVISION OFFICE<br>**Los Angeles** | NAME OF JUDGE<br>**Ernest Robles** |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br><br>**/s/ Dheeraj K. Singhal**<br>**Dheeraj K. Singhal** | | |
| DATE<br>**July 3, 2013** | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>**Dheeraj K. Singhal** | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| **Dheeraj K. Singhal**<br>**30 No. Raymond Ave., Suite 801**<br>**Pasadena, CA 91103**<br>**(626) 689-2407**<br> Fax:<br>**217299**<br>**dksinghal@dcdmlawgroup.com**<br><br><br>*Attorney for Plaintiff* | |

**UNITED STATES BANKRUPTCY COURT**
**Central District of California**

| In re:<br><br>    **Miramar Brands Group, Inc.**<br><br><br><br><br>                                   Debtor(s). | CASE NO: **2:13-bk-25682-ER**<br><br>CHAPTER: **11**<br><br><br>ADVERSARY NUMBER: |
|---|---|
| **Miramar Brands Group, Inc.**<br><br>                                   Plaintiff(s)<br><br>    Versus<br><br>**Paul Shechet**<br><br>                                   Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** |

TO THE DEFENDANT: A Complaint has been filed by the Plaintiff against you. If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint. You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page. The deadline to file and serve a written response is _____ . If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| Hearing Date: _____<br>Time: _____<br>Courtroom: _____ | Place:<br>☒ 255 East Temple Street, Los Angeles, CA 90012<br>☐ 3420 Twelfth Street, Riverside, CA 92501<br>☐ 411 West Fourth Street, Santa Ana, CA 92701<br>☐ 1415 State Street, Santa Barbara, CA 93101<br>☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |
|---|---|

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                   Page 1                                   **F 7004-1.SUMMONS.ADV.PROC**

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.** All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court-approved joint status report form is available on the court's website (LBR form F 7016-1.1) with an attachment for additional parties if necessary (LBR form F 7016-1.1a). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference. **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

**KATHLEEN J. CAMPBELL
CLERK OF COURT**

Date of Issuance of Summons and Notice of Status Conference in Adversary
Proceeding:                                                             **July 3, 2013**

By: _____
                                    Deputy Clerk

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**30 No. Raymond Ave., Suite 801**
**Pasadena, CA 91103**

A true and correct copy of the foregoing document entitled (*specify*):   **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING**   will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 3, 2013 | Dheeraj K. Singhal | /s/ Dheeraj K. Singhal |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                    Page 3                        **F 7004-1.SUMMONS.ADV.PROC**

1  DHEERAJ K. SINGHAL (SBN 217299)
   DIXON L GARDNER (SBN 213119)
2  **DCDM LAW GROUP, PC**
   30 N. Raymond Ave., Suite 801
3  Pasadena, California 91103
   Telephone:  (626) 689-2407
4  Facsimile:  (626) 689-2205
   Email: dksinghal@dcdmlawgroup.com
5          dgardner@dcdmlawgroup.com

6  Proposed Attorneys for Debtor and Debtor in Possession
   MIRAMAR BRANDS GROUP, INC.
7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                **LOS ANGELES DIVISION**

11

12 In re:                                    Case No. 2:13-bk-25682-ER

13 MIRAMAR BRANDS GROUP, INC.,               Chapter 11 Case

14        Debtor and Debtor in Possession.   Adv. No.

15                                           **COMPLAINT FOR DECLARATORY AND
16 MIRAMAR BRANDS GROUP, INC.,               INJUNCTIVE RELIEF**

17        Plaintiff,

18 v.

19 PAUL SHECHET, an individual;
   AMERICAN ARBITRATION
20 ASSOCIATION; and DOES 1 THROUGH
   20, inclusive,
21
          Defendants.

22

23        Plaintiff MIRAMAR BRANDS GROUP, INC. ("Plaintiff," "Debtor," or "Miramar")

24 represents:

25        1.      Plaintiff is a California corporation residing in and doing business in Los Angeles

26 County, California.  The Plaintiff is a Chapter 11 debtor-in-possession in the Central District of

27 California, Case Number 2:13-bk-25682-ER.

28

                                -1-        COMPLAINT FOR DECLARATORY RELIEF
                                                   AND INJUNCTIVE RELIEF

2.      Paul Shechet ("Mr. Shechet") is an individual who resides in Los Angeles County, California.  Mr. Shechet and the American Arbitration Association are parties and participants in the American Arbitration Association, Commercial Arbitration Tribunal, Case No. 72-147-Y-00730-11, styled *Paul Shechet v. Miramar Brands Group, Inc., a California corporation, Stephen Y. Ascher Sr.; Stephen Y Ascher Jr.; and the Ascher Family Trust dated 1991* (the "Shechet Arbitration").

3.      This adversary proceeding is one arising out of the Debtor's Chapter 11 case now pending in this Court.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (G), and (O).

4.      The Plaintiff is unaware of the true names or capacities of Defendant DOES 1 through 20, whether corporate, individual, partner, employee, agent, co-conspirator, or otherwise. The Plaintiff prays leave of the Court to allege said true names and capacities when the same have been ascertained.  The Plaintiff is informed and believes and thereon alleges that, in doing things herein alleged, the Defendants and Does 1 through 20 inclusive were each the agent, employee or servant of the Defendant or that Defendant Does 1 through 20 are in some other means or manner responsible for the acts and conduct hereinafter alleged.

## **BACKGROUND**

5.      On or about August 24, 2006, Stephen Y. Ascher Jr. ("Mr. Ascher Jr."), Stephen Y. Ascher Sr. ("Mr. Ascher Sr."), Mr. Shechet, and other parties, entered into a shareholder agreement entitled "Shareholder Agreement," which is attached hereto as Exhibit A to Shechet's First Amended Complaint, a copy of which is attached as Exhibit 1 hereto.  When the Shareholder Agreement was executed, Mr. Ascher Jr. owned 80% of the Debtor's common stock; Mr. Ascher Sr. owned 10% of the Debtor's common stock; and Mr. Shechet owned the remaining 10%.  Paragraph 26 of the Shareholder Agreement states that any dispute among the parties to this agreement shall be brought before the American Arbitration Association of Pasadena.

6.      On July 16, 2012, Mr. Shechet filed a First Amended Complaint  ("the FAC") in the Arbitration, alleging twelve Causes of Action ("CA1" through "CA12") against the Debtor and its other shareholders: Mr. Ascher Jr. and Mr. Ascher Sr., and the Ascher Family Trust Dated 1991

-2-

1   (collectively these three persons are referred to as the "Aschers").  CA1 through CA8 in the FAC are

2   all identified as "Shareholder Derivative Action[s]."  CA9 through CA11 are identified as "Direct

3   Action[s]."  The FAC is attached hereto as Exhibit 1.

4        7.     CA12 of the FAC alleges that the Debtor breached a loan agreement wherein Mr.

5   Shechet allegedly loaned $75,000.00 to the Debtor's predecessor in interest, IKONN Brands Group,

6   Inc.  This agreement was made on or about March 31, 2007.  A copy of this agreement is attached to

7   the FAC as Exhibit B.

8        8.     The Shechet Arbitration hearing is set for July 29, 2013 to arbitrate CA1 to CA12 in

9   the FAC.  On or about June 14, 2013, the Debtor filed a petition for Chapter 11 bankruptcy relief.

10   The Debtor believes that its business operations and reorganization efforts will be irreparably

11   harmed if the Arbitration is not enjoined.  Further, the Debtor believes that its rights may be severely

12   impacted and its estate significantly injured financially and that the Debtor will be left without an

13   adequate monetary remedy if the Court permits the Shechet Arbitration to proceed as scheduled

14   without enjoining it.  Finally, the Debtor believes that all of the causes of action in the FAC are

15   subject to the automatic stay pending in this Bankruptcy Case because CA1 through CA 8 are

16   shareholder derivative claims, CA9 through CA11 --though labelled "direct shareholder actions" --

17   are really shareholder derivative claims, and CA12 is a claim that alleges that the Debtor breached a

18   loan agreement.  CA12 alleges that Mr. Shechet allegedly loaned $75,000.00 to the Debtor's

19   predecessor in interest, Icon Brands Group, Inc. in an agreement made on or about March 31, 2007.

20        9.     The Debtor believes that the Shechet Arbitration is Mr. Shechet's attempt, as a

21   disgruntled shareholder, to assert claims on behalf of the Debtor to significantly constrain the

22   compensation to Mr. Ascher Jr., the majority shareholder and the individual responsible for most, if

23   not all, of the Debtor's annual revenues.

24        10.    The Debtor believes that Mr. Shechet's efforts to pursue the Shechet Arbitration pose

25   a significant risk that the Debtor may lose the employment of Mr. Ascher Jr., who is the driving

26   force behind the Debtor's growth and success in the past ten years.  Not only did he form Miramar,

27   but he almost single-handedly grew the Debtor to nearly $2 million in annual revenue.  Without Mr.

28

COMPLAINT FOR DECLARATORY RELIEF
AND INJUNCTIVE RELIEF

Ascher Jr. handling the sales and marketing for the Debtor, the Debtor will have a much more difficult time reorganizing and paying all of its creditors.  Mr. Ascher Jr. needs to be fairly compensated in order to continue providing the services he has been rendering to Miramar.  Without Mr. Ascher Jr. to handle much of the Debtor's sales and marketing, the Debtor is concerned that it may lose its current and future sources of revenue.  Mr. Ascher Jr. has been a driving force to have the Debtor enter into multi-million dollar contracts with major retail companies to generate the Debtor's existing revenues.  Without Mr. Ascher Jr. to maintain existing relationships and pursue new business opportunities for the Debtor, the Debtor believes that its efforts to reorganize will be adversely impacted.

## FIRST CLAIM FOR RELIEF

### (For Declaratory Relief)

11.     Plaintiff incorporates herein by reference paragraphs 1 through 10 above as if they were set forth fully herein.

12.     A controversy has arisen between the Plaintiff and the Defendants in that Plaintiff believes that the Shechet Arbitration, if allowed to proceed, will lead to the presentation of evidence and a rendering of a final decision that will create new liabilities against the Plaintiff.  These actions will violate the automatic stay.  Further, the Plaintiff believes that if the Shechet Arbitration is not stayed or enjoined against the non-debtor defendants in the Shechet Arbitration – the Aschers – and the arbitrator receives evidence and renders a final decision against the Aschers, then for all intents and purposes, such a decision will be a judgment against the Debtor because the Aschers are the principal actors in operating and managing the Debtor such that their interests are so intertwined with the Debtor's interests that a judgment against the Aschers is, in effect, a judgment against the Debtor.  The Defendant is almost certain to dispute these conclusions and not forbear from proceeding with the Shechet Arbitration.

13.     The Debtor believes that CA1 through CA11 of the FAC are all shareholder derivative actions and that CA1 through CA12 of the FAC are property of the Debtor's bankruptcy estate and are subject to the automatic stay of this bankruptcy case.

COMPLAINT FOR DECLARATORY RELIEF
AND INJUNCTIVE RELIEF

14.     An actual controversy has arisen between the Plaintiff and the Defendants.  The Plaintiff desires a declaration of his rights and remedies with respect to the actions which the Defendants have undertaken, which the Defendants continue to undertake, and which the Defendants still threaten to take.  This declaration is necessary and appropriate at this time since, if the Defendants continue their actions against either the Plaintiff or the Aschers, the Plaintiff will lose valuable rights and its interests will be irreparably injured.

15.     WHEREFORE, the Plaintiff prays for relief as set forth below.

## **SECOND CLAIM FOR RELIEF**

### **(For Injunctive Relief)**

16.     Plaintiff incorporates herein by reference paragraphs 1 through 15 above as if they were set forth fully herein.

17.     As alleged above, the Plaintiff believes that if the Shechet Arbitration is allowed to proceed as scheduled, the Defendants will violate the automatic stay.  Further, under these circumstances, the Plaintiff may have no remedy against a decision rendered by the arbitrator in the Shechet Arbitration, and for all intents and purposes, such a decision will be a judgment against the Debtor because the Aschers are the principal actors in operating and managing the Debtor such that their interests are so intertwined with the Debtor's interests that a judgment against the Aschers is, in effect, a judgment against the Debtor.  As a result, the Plaintiff will suffer great and irreparable injury in that the Defendants will reach evidentiary findings and legal conclusions with respect to the Shechet Arbitration, which may foreclose issues beyond the ability of the Plaintiff to assert its rights.

18.     The Plaintiff cannot be fully compensated for damages and is without an adequate remedy at law because the exact nature of damages that the Plaintiff will sustain may be difficult to ascertain.   As state above, the Plaintiff believes that its failure to obtain the injunctive relief sought will expose its estate to potential liability beyond the Plaintiff's ability to correct.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

A.     For a declaration of Plaintiff's rights and remedies with respect to Defendants' acts

COMPLAINT FOR DECLARATORY RELIEF
AND INJUNCTIVE RELIEF

1  and conduct undertaken or threatened to be taken as alleged above.

2      B.      For a temporary restraining order and preliminary permanent injunction enjoining

3  Defendants, and each of them, their agents, employees, officers, attorneys, representatives, and any

4  other persons acting in concert with them, and each of them, from doing or causing to be done,

5  directly or indirectly, by any means, any of the following acts: taking any actions with respect to the

6  pending Shechet Arbitration which in any way affects the Plaintiff's rights or remedies in connection

7  with this arbitration.

8      C.      For costs of suit; and for such other relief as is just and proper.

9

10  Dated: July 3, 2013                    DCDM LAW GROUP, PC

11

12                                    By: ___/s/  Dheeraj K. Singhal_____
                                           DHEERAJ K. SINGHAL
13                                         DIXON GARDNER
                                           Proposed Attorneys for Debtor and
14                                         Debtor in Possession
                                           MIRAMAR BRANDS GROUP, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY RELIEF
                                           AND INJUNCTIVE RELIEF

# EXHIBIT 1

David L. Brandon, Esq., State Bar No. 105505
Christian A. Carrillo, Esq., State Bar No. 210962
MORRIS POLICH & PURDY LLP
1055 West Seventh Street, 24th Floor
Los Angeles, California 90017
Telephone: (213) 891-9100
Facsimile: (213) 488-1178

Attorneys for claimant **PAUL SHECHET**

# THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| *In the matter of*: | Case No.: 72 147 Y 00730 11 |
| PAUL SHECHET, | |
| Claimant, | **FIRST AMENDED COMPLAINT FOR** |
| vs. | • **BREACH OF FIDUCIARY DUTY (SHAREHOLDER DERIVATIVE ACTION)** |
| MIRAMAR BRANDS GROUP, INC., a California corporation; STEPHEN Y. ASCHER, SR.; STEPHEN Y. ASCHER, JR.; THE ASCHER FAMILY TRUST DATED 1991; and Does 1 through 100, inclusive, | • **UNJUST ENRICHMENT (SHAREHOLDER DERIVATIVE ACTION)** |
| Respondents. | • **ACCOUNTING (SHAREHOLDER DERIVATIVE ACTION)** |
| | • **CONVERSION (SHAREHOLDER DERIVATIVE ACTION)** |
| | • **DECEIT (SHAREHOLDER DERIVATIVE ACTION)** |
| | • **IMPOSITION OF CONSTRUCTION TRUST (SHAREHOLDER DERIVATIVE ACTION)** |
| | • **DECLARATORY RELIEF (SHAREHOLDER DERIVATIVE ACTION)** |
| | • **INJUNCTION (SHAREHOLDER DERIVATIVE ACTION)** |
| | • **BREACH OF CONTRACT (DIRECT ACTION)** |
| | • **DECEIT (DIRECT ACTION)** |
| | • **INJUNCTION (DIRECT ACTION)** |
| | • **BREACH OF LOAN AGREEMENT** |

///

///

///

**FIRST AMENDED COMPLAINT**

Claimant alleges:

## GENERAL ALLEGATIONS

1.      Claimant Paul Shechet ("Claimant") is an individual and is now, and at all relevant times was, a resident of Los Angeles County, California.

2.      Respondent Miramar Brands Group, Inc. ("Miramar") is, and at all relevant times was, a corporation organized under the laws of the State of California and is qualified to do business in this state, with its principal place of business in Los Angeles County.  Miramar was formerly known as IIKONN Acquisition Corp. ("IIKONN") or as "Icon Brands Group, Inc."  Miramar is named as a nominal Respondent in the derivative claims, and as a substantive Respondent in the individual claims.

3.      Respondent Stephen Y. Ascher, Sr. ("Senior") is, and at all relevant times was, an individual residing in the State of California.

4.      Respondent Stephen Y. Ascher, Jr. ("Junior") is, and at all relevant times was, an individual residing in the State of California.

5.      Respondent The Ascher Family Trust dated 1991 ("Trust") is, and at all relevant times was, a trust of which Senior is the trustee.

6.      Claimant is ignorant of the true names and capacities of the Respondents sued as Does 1 through 100, inclusive, and therefore sue these Respondents by such fictitious names. Claimant will amend this complaint to allege their true names and capacities when ascertained.  Claimant further alleges on information and belief that Does 1 through 100 were the alter ego of each other, such that a unity of interest and ownership between the Does 1 through 100 and the Respondents has ceased to exist, and the adherence to the separate existence of Does 1 through 100 sanctions a fraud and/or promotes an injustice.

7.      At all relevant times, each of the Respondents was the agent and employee of each of the remaining Respondents and was at all times acting within the purpose and scope of such agency and employment.

8.      At all relevant times, Senior and Junior were both directors of Miramar.  At all relevant times, Junior was the President and Secretary of Miramar.  At all relevant times, Senior was the Chief Financial Officer of Miramar.

**FIRST AMENDED COMPLAINT**

9.     At all relevant times, Claimant was the owner of record of shares of stock of Miramar.

## FIRST CAUSE OF ACTION

(Shareholder Derivative Action – Breach of Fiduciary Duty)

(Against all Respondents)

10.     Claimant incorporates the allegations contained in paragraphs 1 through 9.

11.     Claimant, derivatively on behalf of Miramar, seeks relief for the damages sustained, and to be sustained, by Miramar against the Respondents, for violations of state and federal law, including pilfering and looting of the Company's funds, breaches of fiduciary duties, fraud and fraudulently obtaining assets and funds of the Company, misappropriation of the assets and funds of Miramar, gross mismanagement, waste of corporate assets, self-dealing, unjust enrichment and conversion.

12.     By reason of their positions as directors and officers, and as fiduciaries of Miramar, ,and because of their ability to control the business corporate and financial affairs of Miramar, the Respondents owed Miramar and its shareholders the fiduciary obligations of good faith, candor, the duty to exercise due care in the management and administration of the affairs of Miramar and preservation of its assets, and the duty of loyalty to put the interests of Miramar above their own financial interests. Additionally, the Respondents owed a duty to Miramar and its shareholders to operate Miramar in compliance with all applicable federal and state laws, rules, and regulations, and to ensure that Miramar not engage in any unsafe, unsound, or illegal business practices.

13.     To discharge their duties, the Respondents were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and affairs of Miramar and to act only in the best interests of Miramar and not engage in self-dealing.  By virtue of such duties, the Respondents were required, among other things, to:

a.     exercise good faith in ensuring that the affairs of Miramar were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of the business;

b.     manage, conduct, supervise, and direct the employees, business and affairs of Miramar in good faith, in a diligent, honest and prudent manner and in accordance with all applicable laws, rules and regulations, and the Articles of Incorporation and Bylaws;

c.      remain informed as to how Miramar was in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make a reasonable investigation in connection therewith and to take steps to correct that condition or practice, including, but not limited to, maintaining and implementing an adequate system of financial controls to gather and report information internally, to allow directors to perform their oversight function properly to prevent to the use of corporate assets, property, funds, or non-public information for personal profit;

d.      neither violate nor knowingly or recklessly permit any officer, director or employee of Miramar to violate applicable laws, rules, or regulations, and to exercise reasonable supervision over such officers, directors and employees;

e.      refrain from acting to benefit themselves at the expense and to the detriment of Miramar;

f.      make full and accurate disclosure of all material facts, concerning each of the subjects and duties set forth above; and

g.      preserve and enhance Miramar's reputation in the industry and to maintain public trust and confidence in Miramar as a prudently managed institution fully capable of meeting its duties and obligations.

14.     The conduct of the Respondents involves knowing violations of their duties as officers, directors and fiduciaries of Miramar and the absence of good faith on their part, which the Respondents were aware, or should have been aware, posed a risk of serious injury to Miramar.

15.     The Respondents breached their duties of loyalty, due care, candor and/or good faith by themselves engaging, or allowing other Respondents to engage, in self dealing, in the wasting of corporate assets and in a fraudulent scheme to deplete Miramar's assets; by themselves causing, or allowing other Respondents to cause, the pilfering of Miramar's assets and the misrepresentation of Miramar's financial position and dealings, and by themselves violating, or allowing other Respondents to violate, applicable state and federal laws, rules, and regulations.

16.    Claimant brings this action derivatively in the right and for the benefit of Miramar to redress the injuries suffered, and to be suffered, as a direct result of the Respondents' breaches of their fiduciary duties, improper acts and violations of federal and state laws, rules, and regulations.

17.    Claimant will adequately and fairly represent the interests of Miramar in enforcing and prosecuting its rights. Claimant is and has continuously been an owner of Miramar stock during the relevant time periods alleged.

18.    Junior owns 70% of the shares of Miramar. Senior, as trustee, owns 10% of the shares of Miramar. Senior and Junior are a majority of the board of directors of Miramar. As such, Senior and Junior, and the board of directors of Miramar, are incapable, based upon their acts as alleged, of independently and disinterestedly considering a demand to commence and vigorously prosecute this action or seek other redress. Furthermore, all of the Respondents participated in, approved, or through abdication of duty, permitted the wrongs alleged to occur and participated in efforts to conceal or disguise those wrongs from Miramar's stockholders. The Respondents disregarded the wrongs alleged and therefore are not disinterested parties. The Respondents' fraudulent schemes to divert corporate funds for their own use were unlawful and not within the Respondents' business judgment to authorize, ratify or facilitate. Therefore, it would be futile for Claimant to have made demand on Respondents to prosecute this action.

19.    The Respondents, as directors and officers of Miramar, have fiduciary duties to Miramar.

20.    The Respondents have breached their fiduciary obligations to Miramar by various acts, including but not limited to the following:

    (a)    Using Miramar funds to make years of tuition payments on behalf of Junior's daughter, which were more than $27,000.00 in 2010 alone;

    (b)    Using Miramar funds to make years of rental payments on a New York apartment occupied by Junior's daughter, which were more than $29,000.00 in 2010 alone;

    (c)    Using Miramar funds to make years of salary payments to Junior's daughter, a full time student, which were $12,00.00 in 2010 alone;

    (d)    Using Miramar funds for non-business purposes, including but not limited to travel expenses for Junior's family members, the purchase of furniture and interior design services for Junior's personal residences, personal credit card payments, limousines

**FIRST AMENDED COMPLAINT**

for personal usage, personal car payments and expenses, personal snowmobile payments, personal residence payments, family and home expense payments such as cell phones, cosmetics, cable and electricity, family gifts, an personal yacht expenses and vacation trips; and

(e)    Using Miramar funds to make payments to Junior in excess of Junior's authorized compensation package.

21.    These actions were not a good faith exercise of prudent business judgment, and served only to damage Miramar's corporate interests for the benefit of the Respondents personally.

22.    As a direct and proximate result of the Respondents' breaches of their fiduciary duties such, Respondents have caused, and will continue to cause, Miramar to suffer substantial monetary damages, as well as further continuing damage to its reputation, business, and good will.

23.    Miramar has been directly and substantially injured by reason of the Respondents' intentional breach and/or reckless disregard for their fiduciary obligations.  Claimant as a shareholder of Miramar, in the right and for the benefit of Miramar, seeks damages and other relief in an amount to be proven at trial.

24.    The acts of the Respondents were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

## SECOND CAUSE OF ACTION

(Shareholder Derivative Action -- Unjust Enrichment)

(Against all Respondents)

25.    Claimant incorporates the allegations contained in paragraphs 1 through 23.

26.    As a result of the fraudulent scheme to divert Miramar's assets to their own personal use, the Respondents have been and will continue to be unjustly enriched at the expense of and to the detriment of Miramar.  Accordingly, this Court should order the Respondents to disgorge all profits, benefits, and other compensation obtained by the Respondents, jointly and individually, from their wrongful conduct, fiduciary breaches and violations of the law.

///

///

///

1

**THIRD CAUSE OF ACTION**

2

(Shareholder Derivative Action – Accounting)

3

(Against all Respondents)

4        27.        Claimant incorporates the allegations contained in paragraphs 1 through 23.

5        28.        The have received money which is due to Claimant from the Respondents.  The amount

6    due is unknown to Claimant and cannot be ascertained without an accounting.

7

**FOURTH CAUSE OF ACTION**

8

(Shareholder Derivative Action – Conversion)

9

(Against all Respondents)

10        29.        Claimant incorporates the allegations contained in paragraphs 1 through 23.

11        30.        At all relevant times, Claimant was, and still is, entitled to the possession of the property

12    misappropriated and misused by the Respondents.

13        31.        As a result of the Respondents' conversion, Claimant has been damaged.

14        32.        The acts of the Respondents were willful, wanton, malicious, and oppressive, were

15    undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

16

**FIFTH CAUSE OF ACTION**

17

(Shareholder Derivative Action -- Deceit)

18

(Against all Respondents)

19        33.        Claimant incorporates the allegations contained in paragraphs 1 through 23.

20        34.        The Respondents have concealed their actions from Claimant, to whom the Respondents

21    owed a duty to advise of all material facts regarding the Respondents' actions as directors and officers

22    of Miramar.

23        35.        As a result of the actions of the Respondents, Claimant has expended money pursuant to

24    the Respondents' instructions.

25        36.        As a proximate result of Respondent's deceit, Claimant was damaged.

26        37.        The acts of the Respondents were willful, wanton, malicious, and oppressive, were

27    undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

28    ///

**FIRST AMENDED COMPLAINT**

## SIXTH CAUSE OF ACTION

(Shareholder Derivative Action – Imposition of Constructive Trust)

(Against all Respondents)

38.    Claimant incorporates the allegations contained in paragraphs 1 through 23.

39.    By reason of the fraudulent and otherwise wrongful manner in which the Respondents obtained their alleged right, claim or interest in and to the property described, the Respondents have no legal or equitable right, claim or interest in the property, but, instead, the Respondents are involuntary trustees holding the property and profits from the property in constructive trust for Claimant with the duty to convey it to Claimant.

## SEVENTH CAUSE OF ACTION

(Shareholder Derivative Action – Declaratory Relief)

(Against all Respondents)

40.    Claimant incorporates the allegations contained in paragraphs 1 through 23.

41.    An actual controversy has arisen and now exists between Claimant and the Respondents concerning their respective rights and duties in that Claimant contends that the Respondents' actions were improper and that the property obtained was wrongfully obtained, whereas the Respondents dispute these contentions and contends to the contrary.

42.    Claimant desires a judicial determination of their respective rights and duties, and a declaration as to that effect.

## EIGHTH CAUSE OF ACTION

(Shareholder Derivative Action – Injunction)

(Against all Respondents)

43.    Claimant incorporates the allegations contained in paragraphs 1 through 23.

44.    The Respondents' wrongful conduct, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Claimant in that the Respondents will continue to misappropriate and waste Miramar's assets.

///

///

45.     Claimant has no adequate remedy at law for the injuries currently being suffered in that the Respondents will continue to misappropriate and waste Miramar's assets during the pendency of this lawsuit unless this court issues an injunction, directing the Respondents to cease their unlawful activities.

### NINTH CAUSE OF ACTION

(Individual Cause of Action – Breach of Contract)

(Against all Respondents)

46.     Claimant incorporates the allegations contained in paragraphs 1 through 9.

47.     On or about August 24, 2006, in the County of Los Angeles, State of California, Claimant and Respondents entered into a written agreement, a copy of which is attached as Exhibit "A" and incorporated by this reference.

48.     Claimant has performed all conditions, covenants, and promises required by him on his part to be performed in accordance with the terms and conditions of the contract.

49.     The Respondents have breached the contract by various acts, including but not limited to the following:

(a)     Using Miramar funds to make years of tuition payments on behalf of Junior's daughter, which were more than $27,000.00 in 2010 alone;

(b)     Using Miramar funds to make years of rental payments on a New York apartment occupied by Junior's daughter, which were more than $29,000.00 in 2010 alone;

(c)     Using Miramar funds to make years of salary payments to Junior's daughter, a full time student, which were $12,000.00 in 2010 alone;

(d)     Using Miramar funds for non-business purposes, including but not limited to travel expenses for Junior's family members, the purchase of furniture and interior design services for Junior's personal residences, personal credit card payments, limousines for personal usage, personal car payments and expenses, personal snowmobile payments, personal residence payments, family and home expense payments such as cell phones, cosmetics, cable and electricity, family gifts, an personal yacht expenses and vacation trips; and

(e)     Using Miramar funds to make payments to Junior in excess of Junior's authorized compensation package.

(f)     Failing to pay Claimant income to which he was and is entitled.

50.    These actions constitute a breach of the contract for, among other reasons, the Respondents have paid themselves compensation in excess of the amount agreed to in the contract.

51.    By reason of this breach of contract, Claimant has suffered damages.

52.    By the terms of the contract, said written agreement, the Claimant is entitled to recover attorney fees.

### TENTH CAUSE OF ACTION

(Individual Action – Deceit)

(Against all Respondents)

53.    Claimant incorporates the allegations contained in paragraphs 1 through 9 and 47 through 51.

54.    The Respondents have concealed their actions from Claimant, to whom the Respondents owed a duty to advise of all material facts regarding the Respondents' actions as directors and officers of Miramar.

55.    As a result of the actions of the Respondents, Claimant has expended money pursuant to the Respondents' instructions.

56.    As a proximate result of Respondent's deceit, Claimant was damaged.

57.    The acts of the Respondents were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

### ELEVENTH CAUSE OF ACTION

(Individual Action – Injunction)

(Against all Respondents)

58.    Claimant incorporates the allegations contained in paragraphs 1 through 9, 47 through 51 and 54 through 56.

59.    The Respondents' wrongful conduct, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Claimant in that the Respondents will continue to misappropriate and waste Miramar's assets, and reduce Claimant's share value.

60.    Claimant has no adequate remedy at law for the injuries currently being suffered in that the Respondents will continue to misappropriate and waste Miramar's assets during the pendency of

1  this lawsuit unless this court issues an injunction, directing the Respondents to cease their unlawful

2  activities.

3  ### TWELFTH CAUSE OF ACTION

4  (Individual Action – Breach of Loan Agreement)

5  (Against all Respondent Miramar Brands Group, Inc.)

6  61.     Claimant incorporates the allegations contained in paragraphs 1 through 9, 47 through 51

7  and 54 through 60.

8  62.     On or about March 31, 2007, Claimant entered into loan agreement.  Under the terms of

9  this loan agreement, Claimant loaned Icon Brands Group, Inc., the predecessor-in-interest to

10  Respondent Miramar Brands Group, Inc., seventy-five thousand dollars.  A true and correct copy of this

11  agreement is attached to this complaint as Exhibit "B".

12  63.     On or about April, 2011, Respondent Miramar Brands Group, Inc. breached the terms of

13  the loan agreement by failing to repay the loan agreement as required by its terms.

14  64.     Claimant has performed all obligations required of him under the terms of the loan

15  agreement, or has been excused from doing so by Respondent's breach.

16  65.     Claimant has been damaged by Respondent's breach in an amount to be proven at trial,

17  but no less than $75,000 including interest.

18  66.     The loan agreement includes a provision for the recovery of attorney's fees and costs.

19  Accordingly, Claimant is entitled to recovery of his attorney's fees and costs.

20  ### PRAYER FOR RELIEF

21  WHEREFORE, Claimant prays for judgment against Respondents and each of them, as follows:

22  1.     For an accounting between Claimant and the Respondents, for the amount found to be

23  due from the Respondents to Claimant as a result of the accounting and interest on that amount.

24  2.     For a declaration that the Respondents hold the property and profit taken as constructive

25  trustees for the benefit of Claimant;

26  3.     For the court to declare the respective rights and duties of the parties;

27  4.     For an order requiring Respondents to show cause, if any they have, why they should not

28  be enjoined as set forth, during the pendency of this action;

5.      For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Respondents, and each of them, and their agents, servants, and employees, and all persons acting under, in concert with, or for them, from continuing to act in the capacity of officers and directors of Miramar;

6.      For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Respondents, and each of them, and their agents, servants, and employees, and all persons acting under, in concert with, or for them, from continuing to pay the Respondents in excess of the agreed salary in the shareholder agreement;

7.      For compensatory damages in an amount in excess of $4,000,000.00 and in no event, less than the jurisdictional minimum;

8.      For attorney fees;

9.      For punitive damages;

10.     For interest;

11.     For costs of suit; and

12.     For such other and further relief as the court may deem just and proper.

Dated: July 16, 2012                    **MORRIS POLICH & PURDY LLP**

                                        By:_____
                                            David L. Brandon
                                            Christian A. Carrillo
                                            Attorneys for Claimant **PAUL SHECHET**

# EXHIBIT "A"

### SHAREHOLDERS AGREEMENT

This Shareholders Agreement is entered into as of August 24, 2006, by and among Stephen Y. Ascher, Jr., Stephen Y. Ascher Sr., as Trustee of the Ascher Family Trust dated 1991, Paul Shechet, and IIKONN ACQUISTION CORP., a California close corporation (the "Corporation"). Stephen Y. Ascher, Jr., Stephen Y. Ascher Sr., as Trustee of the Ascher Family Trust dated 1991, and Paul Shechet are individually referred to herein as "Shareholder" and collectively referred to as the "Shareholders" or the "Original Shareholders." Any reference to a Shareholder shall also include his or her "Permitted Assignee" (as defined below) and any other person who may acquire shares in the Corporation and agrees to be bound by this Agreement. The parties agree as follows:

1. <u>Recitals and Definitions</u>. For purposes of this Agreement, the following recital and definitions apply:

1.1. This Agreement is made with respect to all Shares (as defined below) of the Corporation's capital stock now or hereafter outstanding, for the purpose of protecting the Corporation and the Shareholders (as defined below) with regard to the sale, purchase, or other transfer of Shares of any Shareholder as provided for in this Agreement.

1.2. "Shares" has the meaning set forth in the Paragraph 2 below.

1.3. "Shareholder" or "Shareholders" has the meaning set forth in the preamble.

1.4. "Transfer" means the sale, disposition, transfer, pledge or encumbrance of the Shares.

1.5. "Permitted Assignee" means a trust for the benefit of the Shareholder, the Trustee of which agrees in writing to hold such Shares subject to and be bound by the terms and conditions of this Agreement, including by way of example and not limitation, the provisions of Paragraph 10.3 hereof, provided, however, that the sole Trustee of such trust must be the Shareholder. Upon the death or incapacity of the Shareholder Trustee, the shares become subject to Paragraph 9 hereof.

1.6. "Personal Representative" means any of the following who obtains title to or control of the Shares owned by a deceased Shareholder: (a) the duly appointed and qualified executor, executrix, administrator, administratrix, administrator with will annexed, or administratrix with will annexed, of the estate of a deceased Shareholder, (b) any other person who may, because of the community property or joint tenancy law of any jurisdiction, acquire without formal probate proceedings any interest in the Shares owned by a deceased Shareholder by reason of the death of such Shareholder, and (c) the trustee of any trust into which any Shares owned by a deceased Shareholder may be transferred.

1.7. "Determined Value" means, with respect to each Share, the latest value per Share set forth on the attached Schedule A in accordance with Paragraph 8 below.

1

MIRAMAR0002704 

2. <u>Ownership of Shares</u>. Upon payment of the consideration therefor, the Shareholders shall own all of the outstanding shares of common stock (collectively, the "Shares") of the Corporation as follows:

| Shareholder | Ownership | Consideration |
|---|---|---|
| Stephen Y. Ascher, Jr. | 800 shares (80%) | 100% interest of Landor Corp. 85% interest of IIKONN Brands Group, Inc. a Nevada Corporation |
| Stephen Y. Ascher, Sr., as Trustee | 100 shares (10%) | 15% interest of IIKONN Brands Group, Inc. a Nevada Corporation |
| Paul Shechet | 100 shares (10%) | $250,000 cash |

3.      <u>S Election</u>. The Corporation shall make a Subchapter "S" election under federal and state laws.

4. <u>Management</u>.

4.1     <u>Board of Directors</u>.    Each Original Shareholder shall be a director of the Corporation. All elections of directors and regular meetings of directors and Shareholders are hereby waived, as are the provisions of Paragraph 303 of the California Corporations Code to the extent that it is inconsistent with the provisions hereof. During the term of this Agreement, the directors shall be responsible to, where appropriate:

4.1.1   Determine in good faith the "current assets" of the Corporation relative to corporate distributions as required by Paragraph 500 of the California Corporations Code;

4.1.2   Cause an annual report to be sent to the Shareholders not later than 120 days after the close of the fiscal year, unless such requirement has been expressly waived in the Bylaws of the Corporation; and,

4.1.3   After filing the Corporation's original Articles of Incorporation and annually thereafter during the applicable filing period in each year, file, on a form prescribed by the California Secretary of State, a statement designating an agent for service of process as required by Paragraph 1502(b) of the California Corporations Code and containing:

(a)     The presently authorized number of the Corporation's directors;



MIRAMAR0002472

(b)  The names and complete business or residence addresses of the directors of the Corporation;

(c)  The names and complete business or residence addresses of the Corporation's chief executive officer, secretary, and chief financial officer;

(d)  The street address of the Corporation's principal executive office;

(e)  If the address of the Corporation's principal executive office is not in California, the street address of the Corporation's principal business office in California, if any; and,

(f)  A statement of the general type of business which constitutes the principal business activity of the Corporation.

4.2  <u>President as Managing Officer</u>. Until this Agreement is otherwise amended, Stephen Y. Ascher, Jr. will serve as the President and Secretary of the Corporation, and will draw a salary of four thousand dollars ($4,000.00) per month. The President shall be the managing officer of the Corporation. The President shall have the control over and the management of the day-to-day operations of the business and affairs of the Corporation.

4.3  <u>Chief Financial Officer</u>. Until this Agreement is otherwise amended, Stephen Y. Ascher, Sr., will serve as the Chief Financial Officer of the Corporation, and will draw a salary of four thousand dollars ($4,000.00) per month.

4.4  <u>Secretary</u>. Until this Agreement is otherwise amended, Paul Sheobet will serve as the Corporate Secretary, and will draw a salary of five hundred dollars ($2340.00) per month.

4.5  <u>Approval of All Shareholders</u>. Notwithstanding the provisions in Paragraphs 4.1 and 4.2 of this Agreement, the written consent of all of the Shareholders shall be required to approve the following actions:

(a) Mergers or consolidations involving the Corporation;

(b) Amendment or repeal of the Articles of Incorporation of the Corporation;

(c) Issuance of shares of any class or other rights relating to the issuance of shares of the Corporation;

(d) Transfer of all, or substantially all, the assets of the Corporation;

(e) Amendment of this Agreement;

MIRAMAR00047 

(f) Voluntary dissolution of the Corporation pursuant to California Corporations Code Paragraph 1900, which is hereby waived.

4.6    Any Original Shareholder or any two directors may, upon forty-eight (48) hours written notice, call a meeting of shareholders or directors, respectively, to discuss any matter of importance to the Corporation or its business.

## 5.  Profit, Loss and Distributions

5.1    Accrual. The net profits or net losses of the Corporation for each fiscal year shall be determined on an accrual basis in accordance with generally accepted principles of accounting.

5.2    Retained Profit. Unless this Paragraph 5.2 is otherwise amended by the unanimous agreement of the Original Shareholders, the Corporation may retain up to a maximum of $250,000 of the net profits of the Corporation, to devote to development or expansion of the business of the Corporation, provided, however, that, subject to Paragraph 5.3, the Corporation shall make a minimum distribution to the Shareholders as provided in Paragraph 5.4. If, subsequent to the execution of this Agreement, one or more of the Original shareholders has a good faith belief that the stated or any subsequent amount of retained profit is either too great or too small, and the Original Shareholders collectively cannot agree as to the appropriate amount of retained profit, the parties may invoke the arbitration procedure set forth in Paragraph 26, or some other mutually agreeable mechanism, to have an independent third party or parties assist the Original Shareholders in arriving at an appropriate level of retained profit.

5.3    Distributions in General. Subject to Paragraphs 500 and 501 of the California Corporations Code which respectively prohibit (1) the making of a distribution unless the Corporation is able to pass either the retained earnings or remaining assets tests specified in Corporations Code Paragraph 500(a) and (b), and (2) the making of a distribution that is likely to make the Corporation unable to meet its liabilities as they mature, the net profits of the Corporation, less any amount or amounts retained by the Corporation pursuant to Paragraph 5.2 or distributed pursuant to Paragraph 5.4 of this Agreement, shall be distributed within sixty (60) days' after the end of each calendar quarter to the Shareholders in proportion to the number of shares of the Corporation owned by them.

5.4    Tax Distribution. The Corporation will use its best efforts to distribute to the Shareholders the Distribution Amount and the Estimated Tax Distributions as set forth below. The purpose of this provision is to attempt to insure that the Shareholders will at all times receive enough cash from the Corporation to pay their federal and state income taxes on the net income that passes through to them under Subchapter S of the Internal Revenue Code of 1986.

(a)    Definitions. For purposes of this Paragraph 5.4, the following definitions and meanings shall apply:



MIRAMAR000274

(1)   "Distribution Amount" with respect to a particular taxable year of the Corporation shall equal the Corporation's S Income for that year multiplied by the Tax Rate, less any amounts already distributed with respect to the same taxable year as Estimated Tax Distributions.

(2)   "S Income" for a particular taxable year of the Corporation shall mean the items of income and gain of the Corporation (not including tax-exempt income) less any items of loss and deduction of the Corporation.

(3)   "Tax Rate" shall equal the product of (a) the highest tax rate in IRC § 1(a) (without regard to IRC § 1(g)) ("Federal Rate"); times (b) 1 minus the highest tax rate for individuals under the income tax laws of the State of California ("State Rate"); plus (c) the State Rate; all determined with respect to the taxable year in question. (Federal Rate x (1 - State Rate), plus State Rate).

(b)   Timing of Tax Distributions. The Corporation shall distribute the Distribution Amount on April 10 of the year following the taxable year for which the Corporation was an S corporation. With respect to a particular taxable year, the Corporation shall make an "Estimated Tax Distribution" on April 10, June 10, and September 10 of that year and on January 10 of the following year. On such date, the Estimated Tax Distribution shall equal the lesser of: (i) one quarter of the S Income for the prior taxable year multiplied by the Tax Rate for that prior year, or (ii) the S Income computed for those months of such particular taxable year ending before the date of the Estimated Tax Distribution multiplied by the Tax Rate for such particular year, less all prior Estimated Tax Distributions with respect to the same year. The Corporation shall not make, however, any Estimated Tax Distributions with respect to its first taxable year as an S Corporation.

6.   Dissolution

6.1   On dissolution of the Corporation, the Corporation shall cease to carry on business except as necessary to wind up its business and distribute its assets. The President, or any Shareholder or Shareholders appointed by the President, shall conduct the winding up procedures and duties, including but not limited to the following acts:

(a) To employ agents and attorneys to liquidate and wind up the affairs of the Corporation;

(b) To continue the conduct of the business insofar as necessary for the winding up of the affairs of the Corporation;

(c) To carry out contracts and collect, pay, compromise, and settle debts and claims for or against the Corporation;

(d) To defend suits brought against the Corporation;

5

MIRAMAR000275 

(e) To sue, in the name of the Corporation, for all sums due or owing to the Corporation or to recover any of its property;

(f) To collect any amounts remaining unpaid on subscriptions to shares or to recover unlawful distributions;

(g) To sell at public or private sale, exchange, convey, or otherwise dispose of all or any part of the assets of the Corporation for cash in an amount deemed reasonable by the President, or his or her appointee(s); and

(h) In general, to make contracts and to take any and all steps in the name of the Corporation that may be proper or convenient for the purposes of winding up, settling, and liquidating the affairs of the Corporation.

7.   **Distribution of Corporate Assets Upon Dissolution**

7.1     The President, or his appointee(s), shall apply the assets of the Corporation in the following order:

(a) To all debts and liabilities of the Corporation in accordance with the law, including the expenses of dissolution and liquidation, but excluding any debts owing to a Shareholder;

(b) To all senior debts owing to a Shareholder in accordance with the terms of any subordination agreement;

(c) To the accrued and unpaid interest on unsubordinated debts owing to a Shareholder;

(d) To the principal of unsubordinated debts owing to a Shareholder;

(e) To undistributed net profits of the Corporation, subject to the provisions of Paragraph 5 of this Agreement;

(f) To the Shareholders in proportion to the number of shares of the Corporation held by each.

8. **Purchase of Life Insurance.** The Corporation (may), in its sole discretion, purchase and maintain in force, with respect to any or all of the Original Shareholders, one or more life insurance policies insuring the life of such Shareholder. The Corporation shall be the beneficiary of such life insurance policies. The face amount of the life insurance policy(ies) with respect to a Shareholder must be equal to the Determined Value (as defined below) of the Shares owned by the Shareholder. At reasonable intervals, but no less frequently than once annually, the Shareholders of the Corporation shall determine a value for each Share (the "Determined Value"), which must be recorded on the attached Schedule A. The Determined Value is

MIRAMAR0002776 

calculated based upon the sum of the values of the Corporation's present assets at the close of the calendar month preceding the valuation (including without limitation cash in banks, receivables and property, if any) minus the sum of the values of the Corporation's present liabilities at the close of the calendar month preceding the valuation (including without limitation any invoices from consultants, monthly operating expenses, insurance obligations, loan obligations and any other outstanding obligations payable within one year from the date the Determined Value is being calculated), divided by the total number of outstanding Shares of the Corporation. To the extent an asset of the Corporation is a future income stream, an appropriate present value calculation will be performed to ascertain the value of the asset for purposes of determining the Determined Value. The initial Determined Value, as of the date of this Agreement, is set forth on the attached Schedule A. The Corporation shall use its best efforts to arrange to increase promptly the face amount of the insurance policy(ies) with respect to each Shareholder upon any change in the Determined Value to the extent necessary to comply with this paragraph. Each Shareholder shall cooperate with the Corporation to obtain the life insurance policy(ies) with respect to such Shareholder. The failure of the Shareholders on an annual basis to determine the Determined Value shall have no effect.

9. <u>Purchase at Death</u>.

9.1    Upon the death of any Shareholder, the Corporation shall purchase, and the deceased Shareholder's Personal Representative shall sell to the Corporation, that portion of the Shares owned by the deceased Shareholder as of the time of death that the Corporation is able to purchase based on the life insurance proceeds available to it pursuant to Paragraph 8 above, if any, and in accordance with this Paragraph 9.1.. The price for such Shares is the product of the Determined Value and the number of such Shares.

9.2.    Promptly upon the date (the "Payment Date") that is the later of (a) the Corporation's receipt of the proceeds from the life insurance policy(ies) insuring the life of the deceased Shareholder, and (b) determination of the price for such Shares pursuant to Paragraphs 9.1 above, the Corporation shall pay to the decedent's Personal Representative the lesser of such purchase price or the amount of the proceeds from such life insurance policy(ies), and such Personal Representative shall concurrently validly endorse in favor of (and transfer to) the Corporation the share certificate(s) for such Shares that the Corporation is able to purchase based on available life insurance proceeds and the purchase price as determined above.

9.3    If the proceeds from the life insurance policy(ies) insuring the life of the deceased Shareholder are insufficient to enable the Corporation to purchase all of the deceased shareholder's shares, or the Corporation was unable to obtain any such insurance policies on the life of a Shareholder, then the Corporation may purchase, at its sole option, the balance (or all, al the case may be) of the deceased shareholder's Shares at the purchase price for such Shares, as determined in accordance with Paragraph 9.1 above (the "Excess Purchase Price") in quarterly installments of principal, commencing three months after the Payment Date, in amounts that are no less than the lesser of the Excess Purchase Price and $5,000.00. However, if the Excess Purchase Price exceeds $200,000.00, then each quarterly installment must be increased above $5,000.00 by an amount that will cause the Excess Purchase Price to be paid in 20 equal

MIRAMAR 

quarterly installments. The Corporation shall, on or before the Payment Date, deliver to the decedent's Personal Representative a promissory note in the original principal amount of the Excess Purchase Price, secured by the Shares purchased. The note shall bear interest, from the Payment Date until payment of the last of such quarterly installments, at the Bank of America reference rate as of the Payment Date, adjusted annually, but in no event greater than the maximum rate permitted by law. All such accrued and unpaid interest shall be payable concurrently with payment of each quarterly installment. Any payment shall be first credited to accrued but unpaid interest. The Corporation shall, concurrently with the making of the note, execute and deliver to the decedent's Personal Representative a security agreement, which must provide that all of the decedent's Shares purchased by the Corporation serve as a security for performance of such note. The share certificate(s) for such Shares serving as security may be retained by the decedent's Personal Representative pursuant to such security agreement, although such share certificate(s) must be validly endorsed in favor of the Corporation pursuant to Paragraph 9.2 above.

        9.4    If the Corporation is legally prohibited from purchasing all of the deceased Shareholder's Shares, then the Corporation shall purchase, to the extent of available life insurance proceeds, at a price based upon the value per Share determined pursuant to Paragraphs 9.1 above, as many Shares as it is legally permitted to purchase, including any shares the Corporation may purchase pursuant to Paragraph 9.3 above, and any remaining Shares (the "Remaining Shares") may be purchased in accordance with Paragraphs 9.5 or 9.6 below. The Corporation shall deliver a notice (the "Remaining Shares Notice") to the surviving Shareholder(s) as soon as possible if there are any Remaining Shares.

        9.5.    Each surviving Shareholder may purchase that portion of the Remaining Shares in the proportion such surviving Shareholder's shares have to the sum of all surviving Shareholders' shares (e.g., a surviving shareholder who owns 25% of the outstanding shares (excluding the Remaining Shares) may purchase 25% of the Remaining Shares), at the same price per Share that the Corporation is obligated to pay under Paragraph 9.1 above. Notwithstanding the foregoing, if there are more than one surviving Shareholder, and any surviving Shareholder elects to purchase less than the number of Remaining Shares to which such surviving shareholder is entitled to purchase pursuant to this paragraph, each of the other surviving Shareholder(s) who purchased Remaining Shares ("Purchasing Shareholders") may purchase that portion of such Remaining Shares equal to the total number of Remaining Shares not purchased pursuant to the first sentence of this paragraph calculated in the manner described in such sentence. The surviving Shareholder(s) is/are not obligated to purchase his/their total allotment of Remaining Shares and may purchase a portion of such allotment.

        9.6.    Any surviving Shareholder(s) purchasing the deceased Shareholder's Shares pursuant to Paragraph 9.5 above shall pay such purchase price to the decedent's Personal Representative in quarterly installments of principal, commencing three months after the Payment Date, in amounts that are no less than the lesser of such purchase price for the Remaining Shares and $5,000.00. Notwithstanding the foregoing, if the payments in this paragraph would extend beyond 20 quarterly installments, each such quarterly installment must be increased by an equal percentage amount that will cause the purchase price for the Remaining


MIRAMAR000027

Shares to be paid in 20 equal quarterly installments. Each surviving Shareholder purchasing Shares shall, promptly upon delivery of the Remaining Shares Notice, deliver to such Personal Representative a promissory note for such quarterly installments, secured by the Shares purchased. Such note(s) shall bear interest, from the Payment Date until payment of the last of such quarterly installments, at the Bank of America reference rate as of the Payment Date, adjusted annually, but in no event greater than the maximum rate permitted by law. All such accrued and unpaid interest shall be payable concurrently with payment of each quarterly installment. Any payment shall be first credited to accrued but unpaid interest. Each surviving Shareholder purchasing Shares shall, concurrently with the making of his note, execute a security agreement, which must provide that the Shares purchased serve as security for performance of such note. The decedent's Personal Representative may retain the share certificate(s) for the Shares serving as security pursuant to the security agreement.

10.    Restriction on Transfer of Shares

10.1    Restriction. No Shareholder may, without the written consent of all of the other Shareholders, voluntarily or involuntarily, directly or indirectly, Transfer the Shares now owned or hereafter acquired, except as set forth herein. Consent to one Transfer shall not be considered as consent to any subsequent Transfer. Any transferee, whether voluntary or involuntary, shall take such Shares subject to the terms and conditions of this Agreement. Any Transfer must be conditioned upon the transferee becoming a signatory to this Agreement.

10.2    Permitted Transfers. Notwithstanding any provision contained in this Agreement, an individual Shareholder may Transfer his Shares, or a portion or interest therein to a Permitted Assignee.

10.3    Conditions to Transfer. Notwithstanding any provision of this Agreement to the contrary, no Shareholder shall Transfer all or any part of the Shares, or an interest therein:

(a)    Unless the Corporation has received and accepted an acceptable written opinion of counsel which: (a) specifies the particulars of the proposed transaction; and (b) states that such action complies or will comply with all applicable federal and state securities laws;

(b)    To a person who owns or controls, directly or indirectly, or is employed by or is, a company or enterprise, which competes with the Corporation;

(c)    If the Transfer might lead to the release of or access to confidential or proprietary information of the Corporation or information which, if released outside the Corporation, may have a material adverse impact on the Corporation or its competitive advantage.

For purposes of this Paragraph 10.3, the determination of whether a particular condition has been satisfied shall be made by the Corporation's Board of Directors, which determination shall be final and conclusive.

MIRAMAR000279

10.4  Non Compliance.  The Corporation may refuse to enter any purported Transfer of Shares on the Corporation's books if:  (a) the provisions of this Agreement are not complied with; or (b) the transferring Shareholder is indebted to the Corporation.  The Corporation shall have a lien on the transferred Shares to secure any indebtedness due by the Shareholder whose Shares are being transferred.

10.5  Invalidity of Transfer.  Any purported Transfer in violation of this Agreement shall be void and shall not operate to transfer any interest or title to the purported transferee.

## 11.  Purchase on Marital Dissolution.

11.1.  If one of the Shareholders enters into a dissolution of marriage, the Shareholder, the Corporation and the other Shareholders may, in their sole discretion, purchase all, but not less than all, of whatever interest is held by such Shareholder's spouse in the stock, as more fully set forth below.  By signing the spousal consent attached hereto, such Shareholder's spouse agrees to sell the shares pursuant to the terms contained herein.

11.2.  The Shareholder whose marriage is to be dissolved may purchase (and require his spouse to sell) whatever interest is held by such Shareholder's spouse in the stock held in their name, or owned by them (the "Community Shares").  Such option may be exercised by such Shareholder giving notice to his spouse, with a copy to the Corporation, within 30 days following the entry of the interlocutory decree of dissolution.  The purchase price for the Community Shares must be determined and paid to the selling spouse in accordance with Paragraphs 9.1 and 9.6 above.

11.3.  If the Shareholder whose marriage is to be dissolved has not exercised the option to purchase the Community Shares, the Corporation may, at its option, purchase the Community Shares.  Such option shall be exercisable for a period of 30 days after termination of the 30-day period set forth in Paragraph 11.2 above.  The purchase price for the Community Shares must be determined and paid to the selling spouse in accordance with Paragraphs 9.1 and 9.6 above.

11.4.  If the Shareholder whose marriage is to be dissolved and the Corporation fail or refuse to purchase the Community Shares within the periods specified above, the remaining Shareholder(s) may, at their option, purchase the Community Shares based on the proportions described in Paragraph 9.5 above.  Such option shall be exercisable for a period of 30 days after termination of the 30-day period set forth in Paragraph 11.3 above.  The purchase price for the Community Shares must be determined and paid to the selling spouse in accordance with Paragraphs 9.1 and 9.6 above.

## 12.  Right of First Refusal.

12.1.  If any Shareholder desires to sell or transfer any of the Shares owned by such Shareholder to any person or entity not a party to this Agreement or to encumber such Shares in

MIRAMAR0002 

favor of a person or entity not a party to this Agreement, such Shareholder (the "Designating Shareholder") shall deliver a written notice (the "Notice") to the Corporation and the other Shareholder(s) (the "Other Shareholder(s)") of such intention to sell, transfer or encumber. The Notice shall name the proposed purchaser, transferee or lienholder, specify the Shares to be purchased, transferred or encumbered (the "Refusal Shares"), the price per Share (the "Refusal Price"), and the other terms of payment or encumbrance (the "Refusal Terms").

12.2.  The Other Shareholder(s) is/are granted an option (i) in the event of a proposed sale, to purchase any of the Refusal Shares for the Refusal Price and on the Refusal Terms or (ii) in the event of a proposed encumbrance, to receive or place a lien on any of the Refusal Shares, and to loan funds to the Designating Shareholder on the Refusal Terms, based on the proportions described in Paragraph 9.5 above (with the Other Shareholder(s) constituting Surviving Shareholder(s) for purposes of such calculation).

12.3.  The option set forth in Paragraph 12.2 above will remain in effect for 20 days after delivery of the Notice and may be exercised by so notifying the Designating Shareholder and the Corporation within such applicable option periods. If such option is timely exercised in the aggregate as to all of the Refusal Shares, the Other Shareholder(s) shall pay the purchase price (or loan funds) to the Designating Shareholder, pursuant to the Refusal Price and Refusal Terms and the Designating Shareholder shall validly endorse in favor of the purchasing Shareholder(s), the share certificate(s) for the Refusal Shares, and shall tender to the purchasing Shareholder(s) such share certificate(s) except for any to be retained as security pursuant to the Refusal Terms. If such option is not exercised within such applicable option period as to all the Refusal Shares, then the Designating Shareholder may sell, transfer or encumber the Refusal Shares at any time within 90 days from the expiration of such applicable option period but only for the Refusal Price, on the Refusal Terms and to the proposed purchaser, transferee or lienholder specified in the Notice. Such purchaser, transferee or lienholder (whether a Shareholder or other person) will take and hold the Refusal Shares subject to this Agreement as it applies to the Designating Shareholder. Neither a change in the number of Refusal Shares, the Refusal Price, the Refusal Terms or the proposed purchaser, transferee or lienholder specified in the Notice, may be made by the Designating Shareholder without giving a new Notice to the Other Shareholder(s) in accordance with this Article 12.

12.4.  In the event of a proposed sale, if the Other Shareholders decline to exercise the option to purchase the Refusal Shares offered by the Designating Shareholder(s) who hold a majority of the then outstanding Shares (the "Majority Holders"), such Majority Holders may require the Other Shareholders to transfer all of their Shares to the proposed purchaser for the same price per share and on the same terms and conditions as the Majority Holders ("Drag Along Rights"). The Majority Holders will notify the Other Shareholders that they intend to exercise Drag Along Rights at the time the Majority Holders deliver the Notice. In the event Drag Along Rights are exercised, upon consummation of the proposed transaction the Other Shareholders shall take such actions and execute such documents and instruments as may be necessary or desirable to transfer their Shares to the transferee.

MIRAMAR00028 

12.5.  In the event of a proposed sale, if no Other Shareholder exercises the option to purchase the Refusal Shares and the proposed transaction does not involve Drag Along Rights, any or all of the Other Shareholders may participate in the proposed sale along with the Designating Shareholder on the terms and conditions contained in the Notice.  Any Other Shareholder who desires to participate in the proposed sale (a "Participating Shareholder") must notify the Designating Shareholder(s) of the number of Shares such Participating Shareholder desires to sell (the "Participation Notice") at the latest 20 days after delivery of the Notice.  After receipt of all Participation Notices, the Designating Shareholder(s) shall offer the additional Shares to the proposed purchaser.  If the proposed purchaser does not wish to purchase all of the offered shares, the Designating Shareholder(s) and the Participating Shareholders may participate in the ultimate sale in the proportion the number of Shares they wish to sell has to the aggregate number of Shares offered.

13.      Maintenance of S Corporation Status; Distributions

13.1     Assignment or Transfer to Disqualified Person.  If a Shareholder assigns or transfers Shares ("Disqualifying Transferor") to a person who is not eligible to own shares in an S Corporation, and whose ownership would cause a termination of S Corporation status, the purported transfer to such person (a "Disqualified Person") shall be of no force and effect and the Corporation and the remaining Shareholders shall have the right (but not the obligation) to immediately purchase all Shares purported to be transferred (the "Disqualifying Shares").  No later than five (5) business days following the date on which the Corporation determines that a purported transfer to a Disqualified Person has occurred the Corporation shall give notice of the purported transfer to the remaining Shareholders ("Notice of Disqualifying Event").  The Notice of Disqualifying Event shall set forth the name of the Disqualifying Transferor and Disqualified Person, the number of shares involved and all other pertinent information available to the Corporation.

13.2     First Option.  For a thirty (30) day period following the date of the Notice of Disqualifying Event, the Corporation shall have the right to purchase all or part of the Disqualifying Shares.

13.3     Second Option.  If the Corporation does timely not exercise its option for all of the available Disqualifying Shares, the remaining Shareholders shall have the option based upon the proportions described in Paragraph 9.5 above to purchase the available Disqualified Shares for a thirty (30) day period following the expiration of the first option period.

13.4     Exercise of Options.  Any option to purchase the Disqualifying Shares shall be exercised by timely delivery of written notice to the Disqualifying Transferor and the Disqualified Person.

13.5     Purchase Price and Terms.  Parties electing to exercise an option pursuant to this Article 13 may elect to purchase the Disqualified Shares at: (a) the price and terms specified in the Notice of Disqualifying Event if such information is available; or (b) at the Determined Value payable to the Disqualifying Transferor in quarterly installments of principal,

12

MIRAMAR000282

pursuant to the mechanism described in Paragraph 9.6 above in the case of the Corporation and Paragraph 9.3 above in the case of the other Shareholder(s). The Corporation or the remaining Shareholders exercising their option to purchase, as the case may be shall, promptly upon the exercise of their respective options, but no later than 10 days thereafter, deliver to the Disqualifying Transferor the consideration referred to in subParagraph (a) if that alternative is elected, or if the alternative set forth in subParagraph (b) is elected, a promissory note, secured by the Shares purchased, for such purchase price. Such note shall bear interest, from the date of the purchase until payment of the last of such quarterly installments, at the Bank of America reference rate as of the date of purchase, adjusted annually, but in no event greater than the maximum rate permitted by law. All such accrued and unpaid interest shall be payable concurrently with payment of each of such quarterly installments. The Corporation or the remaining Shareholders exercising their option to purchase under the alternative set forth in subParagraph (b) as the case may be, shall concurrently with the making of such note, execute and deliver to the Disqualifying Transferor a security agreement, which shall provide that the Shares purchased serve as security for performance of such note.

13.6   Failure to Exercise Options. If the foregoing options are not exercised with respect to all of the Disqualified Shares, the Disqualifying Transferor may transfer the Disqualified Shares to the Disqualified Person.

13.7   Continued Applicability. It shall be a condition to the Transfer of the Disqualified Shares that the Disqualified Person agrees in writing to hold the Disqualified Shares subject to and be bound by the terms and conditions of this Agreement.

13.8   Inadvertent Terminations. Despite any other provision of this Article 9, if any transaction occurs which may terminate the S Corporation status of the Corporation, all parties acknowledge their obligations to:

(a)   take all necessary and appropriate steps to cure the potential violation within a reasonable time after discovery; and

(b)   accept adjustments, which may be required by the Internal Revenue Service as a condition for ruling that the determination was inadvertent.

13.9   Ruling. If a transaction occurs which may result in the disqualification of the Corporation as an S Corporation, the Corporation shall seek to obtain an "inadvertent termination ruling" from the Internal Revenue Service to the effect that the potentially disqualifying transaction will not affect the Corporation's continuing S Corporation status.

13.10   Corporate Actions. The Corporation shall not without the consent of all of the issued and outstanding Shares:

(a)   issue any Shares to a Disqualified Person;

(b)   issue an additional class of Shares;

MIRANA E000483



(c)    issue any debt instruments, other than in the Corporation's ordinary course of business with independent third parties, without obtaining an opinion of counsel that such issuance will not adversely affect the Corporation's S Corporation status;

(d)    issue warrants or options to buy Shares to any Disqualified Person; or

(e)    enter into the banking, thrift or insurance company business, or make any proscribed tax elections which would adversely affect S Corporation status.

14.    Legend.  Each Shareholder shall promptly present to the secretary of the Corporation the certificate(s) representing the Shares presently owned or hereafter owned by him (including without limitation any shares held be a Permitted Assignee) and the secretary of the Corporation shall affix on such certificate(s) in a prominent manner a legend in substantially the following form:

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("THE ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. THE TRANSFER, ENCUMBRANCE, DISPOSITION OR RESALE OF THE SECURITIES REPRESENTED HEREBY IS ALSO SUBJECT TO A SHAREHOLDERS' AGREEMENT BETWEEN THE ISSUER AND ITS SHAREHOLDERS DATED AUGUST 24, 2006, AS IT MAY BE AMENDED FROM TIME TO TIME."

15.    Termination.  This Agreement terminates on the first of the following to occur: (a) the dissolution of the Corporation; (b) at such time as only one shareholder owns shares; or (c) upon agreement of all the Shareholders to terminate the Corporation's statutory close corporation status.

16.    Shareholders' Wills.  Each Shareholder shall promptly include in his or her will, and in any future will of his, a direction and authorization to such Shareholder's Personal Representative to comply with the provisions of this Agreement, including without limitation the sale of his or her Shares in accordance with this Agreement. The failure of any Shareholder to comply with the preceding sentence shall not waive or limit any provision of this Agreement.

MIRAMARC00284

EXHIBIT 6



17. Preemptive Rights. As provided in the Corporation's Articles of Incorporation, each Shareholder has full preemptive rights, as defined by law, to subscribe for or purchase that Shareholder's proportional part of any further or additional shares of stock issued at any time by the Corporation.

18. Governing Law. This Agreement is governed by and construed in accordance with the laws of the State of California, irrespective of California's choice-of-law principles.

19. Further Assurances. Each party to this Agreement shall execute and deliver all instruments and documents and take all actions as may be reasonably required or appropriate to carry out the purposes of this Agreement.

20. Counterparts and Exhibits. This Agreement may be executed in counterparts, each of which is deemed an original and all of which together constitute one document. All exhibits attached to and referenced in this Agreement are incorporated into this Agreement.

21. Time of Essence. Time and strict and punctual performance are of the essence with respect to each provision of this Agreement.

22. Attorney's Fees. The prevailing party(ies) in any litigation, arbitration, mediation, bankruptcy, insolvency or other proceeding ("Proceeding") relating to the enforcement or interpretation of this Agreement may recover from the unsuccessful party(ies) all costs, expenses, and actual attorney's fees (including expert witness and other consultants' fees and costs) relating to or arising out of (a) the Proceeding (whether or not the Proceeding proceeds to judgment), and (b) any post-judgment or post-award proceeding including, without limitation, one to enforce or collect any judgment or award resulting from the Proceeding. All such judgments and awards shall contain a specific provision for the recovery of all such subsequently incurred costs, expenses, and actual attorney's fees.

23. Modification. This Agreement may be modified only by a contract in writing executed by the party to this Agreement against whom enforcement of the modification is sought.

24. Headings. The paragraph headings in this Agreement: (a) are included only for convenience, (b) do not in any manner modify or limit any of the provisions of this Agreement, and (c) may not be used in the interpretation of this Agreement.

25. Prior Understandings. This Agreement and all documents specifically referred to and executed in connection with this Agreement: (a) contain the entire and final agreement of the parties to this Agreement with respect to the subject matter of this Agreement, and (b) supersede all negotiations, stipulations, understandings, agreements, representations and warranties, if any, with respect to such subject matter, which precede or accompany the execution of this Agreement.

EXHIBIT 6     EXHIBIT 7

MIRAMAR000285

26. <u>Arbitration</u>. Any claim or controversy arising out of or relating to this Agreement, or arising out of or relating to the Corporation, or the rights or obligations of the Shareholders as shareholders, directors, officers, or employees of the Corporation shall be settled and determined by arbitration in the City of Pasadena, California, according to the Commercial rules of the American Arbitration Association in effect at the time. If the parties to a dispute cannot agree upon a single arbitrator, the arbitration shall be conducted before a panel of three arbitrators, one selected by the plaintiff(s), one selected by the defendant(s), and a third selected by the two arbitrators selected by the parties.

27. <u>Interpretation</u>. Whenever the context so requires in this Agreement, all words used in the singular may include the plural (and vice versa) and the word "person" includes a natural person, a corporation, a firm, a partnership, a joint venture, a trust, an estate or any other entity. The terms "includes" and "including" do not imply any limitation. For purposes of this Agreement, the term "day" means any calendar day and the term "business day" means any calendar day other than a Saturday, Sunday or any other day designated as a holiday under California Government Code Paragraphs 6700-6701. Any act permitted or required to be performed under this Agreement upon a particular day, which is not a business day, may be performed on the next business day with the same effect as if it had been performed upon the day appointed. No remedy or election under this Agreement is exclusive, but rather, to the extent permitted by applicable law, each such remedy and election is cumulative with all other remedies at law or in equity.

28. <u>Partial Invalidity</u>. Each provision of this Agreement is valid and enforceable to the fullest extent permitted by law. If any provision of this Agreement (or the application of such provision to any person or circumstance) is or becomes invalid or unenforceable, the remainder of this Agreement, and the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, are not affected by such invalidity or unenforceability unless such provision or the application of such provision is essential to this Agreement.

29. <u>Notices</u>. Each notice and other communication required or permitted to be given under this Agreement ("Notice") must be in writing. Notice is duly given to another party upon: (a) hand delivery to the other party, (b) receipt by the other party when sent by facsimile to the address and number for such party set forth below (provided, however, that the Notice is not effective unless a duplicate copy of the facsimile Notice is promptly given by one of the other methods permitted under this paragraph), (c) three business days after the Notice has been deposited with the United States postal service as first class certified mail, return receipt requested, postage prepaid, and addressed to the party as set forth below, or (d) the next business day after the Notice has been deposited with a reputable overnight delivery service, postage prepaid, addressed to the party as set forth below with next-business-day delivery guaranteed, provided that the sending party receives a confirmation of delivery from the delivery-service-provider.

To:   Stephen Y. Ascher, Jr.
      PO Box 2139

16



MIRAMAR000286

EXHIBIT 6    EXHIBIT 7

Pasadena, CA 91101
(626) 683-0007 (Telecopy)

To:    Stephen Y. Ascher, Sr.
       1210 Mill Lane
       San Marino, CA 91108
       (626) 683-0007 (Telecopy)


To:    Paul Shechet
       950 Singing Wood Drive
       Arcadia, CA 91006
       (323) 235-2304 (Telecopy)


To:    IIKONN ACQUISTION CORP.
       230 E. Union St.
       Pasadena, CA 91101
       (626) 683-0007 (Telecopy)

Each party shall make a reasonable, good faith effort to ensure that it will accept or receive Notices to it that are given in accordance with this paragraph. A party may change its address for purposes of this paragraph by giving the other party(ies) written notice of a new address in the manner set forth above.

   30.  Waiver. Any waiver of a default or provision under this Agreement must be in writing. No such waiver constitutes a waiver of any other default or provision concerning the same or any other provision of this Agreement. No delay or omission by a party in the exercise of any of its rights or remedies constitutes a waiver of (or otherwise impairs) such right or remedy. A consent to or approval of an act does not waive or render unnecessary the consent to or approval of any other or subsequent act.

   31.  Successors and Assigns. This Agreement shall inure to the benefit of and be binding on the successors and permitted assigns of the parties hereto.

   32.  Filing of Agreement. A copy of this Agreement, as amended from time to time, shall be filed with the Secretary of the Corporation for inspection by any prospective purchaser of shares of the Corporation.

   33.  Drafting Ambiguities. Each party to this Agreement have reviewed and revised this Agreement. The rule of construction that ambiguities are to be resolved against the drafting party or in favor of the party receiving a particular benefit under an agreement may not be employed in the interpretation of this Agreement or any amendment to this Agreement.

MIRAMAR000287

EXHIBIT 6      EXHIBIT 7

34. Third Party Beneficiaries.  Nothing in this Agreement is intended to confer any rights or remedies on any person or entity other than the parties to this Agreement and their respective successors-in-interest and permitted assignees, unless such rights are expressly granted in this Agreement to another person specifically identified as a "Third Party Beneficiary."

35. Spousal Approval.  Each party to this Agreement shall obtain the consent and approval of his or her spouse, if any, or future spouses, by such signature to this Agreement.

36. All Shares Subject to Agreement.  This Agreement shall extend to and cover all capital stock in the Company now owned or later acquired by the Shareholders or any transferee or other person acquiring Shares or an interest therein from a Shareholder or a Shareholder's transferee or successor in interest during the term of this Agreement.

STEPHEN Y. ASCHER, SR.

STEPHEN ASCHER, JR.

PAUL SHECHET

IKONN ACQUISITION CORP.,
a California corporation

By: _____
    STEPHEN Y. ASCHER, JR., President

EXHIBIT 6    EXHIBIT 7

MIRAMAR000288

<u>Spousal Consent</u>

I, *Kam Ling Shechet,* acknowledge and agree that I

(1) have read the Shareholder Agreement dated ___8-24___, 2006 among STEPHEN Y. ASCHER, JR., STEPHEN Y. ASCHER, SR., PAUL SHECHET, and IIKONN ACQUISITION CORP., a California corporation (the "Agreement"), and clearly understand the provisions of the Agreement, including without limitation the provisions containing obligations to sell certain Shares (as defined in the Agreement) in accordance with the Agreement and imposing restrictions on the sale of Shares,

(2) approve, consent and agree to be bound by all of the provisions of the Agreement, and

(3) shall not seek to dispose of by will or otherwise any community interest in the Shares, except to my above-named spouse.

Dated: __10-06__, 2006

MIRAMAR000290

<u>Spousal Consent</u>

I, _____, acknowledge and agree that I

(1) have read the Shareholder Agreement dated _____, 2006 among STEPHEN Y. ASCHER, JR., STEPHEN Y. ASCHER, SR., PAUL SHECHET, and IIKONN ACQUISITION CORP., a California corporation (the "Agreement"), and clearly understand the provisions of the Agreement, including without limitation the provisions containing obligations to sell certain Shares (as defined in the Agreement) in accordance with the Agreement and imposing restrictions on the sale of Shares,

(2) approve, consent and agree to be bound by all of the provisions of the Agreement, and

(3) shall not seek to dispose of by will or otherwise any community interest in the Shares, except to my above-named spouse.

Dated: _____, 2006               _____

MIRAMAR000289

# EXHIBIT "B"

# SHAREHOLDERS' LOAN AGREEMENT

**THIS SHAREHOLDERS LOAN AGREEMENT (this "Agreement") dated this 31st day of March, 2007**

**BETWEEN:**

Paul Shechet (Loan Amount--$75,000) of 950 Singing Wood Dr., Arcadia, CA 91006;
Stephen Y. Ascher, Jr. (Loan Amount--$50,000) of 840 E. Green Street, Suite 301
Pasadena, CA 91101; and
Stephen Y. Ascher Sr. (Loan Amount--$25,000) of 1210 Mill Lane, San Marino, CA
91108
**(collectively and individually the "Lender")**

**OF THE FIRST PART**

**AND**

Icon Brands Group, Inc. of 840 East Green St. Suite 301, Pasadena, CA 91101
**(the "Borrower")**

**OF THE SECOND PART**

**IN CONSIDERATION OF** the Lender loaning certain monies (the "Loan") to the Borrower, and the Borrower repaying the Loan to the Lender, both parties agree to keep, perform and fulfill the promises and conditions set out in this Agreement:

### Loan Amount & Interest

1. The Lender promises to loan one hundred fifty thousand ($150,000.00 ) USD, to the Borrower and the Borrower promises to repay this principal amount to the Lender, at such address as may be provided in writing, with interest payable on the unpaid principal at the rate of 20.0 percent per annum, calculated monthly not in advance.

### Payment

2. This Loan will be repaid in consecutive monthly installments of interest only on the 1st day of each month commencing the month following execution of this Agreement and continuing until March 31, 2010 with the balance then owing under this Agreement being paid at that time.

3. Repayment of the full principal amount, plus the applicable interest, to the address set out in this Agreement, or to the address agreed upon by the parties, is good and sufficient payment to all individual lenders.

**Default**

4. Notwithstanding anything to the contrary in this Agreement, if the Borrower defaults in the performance of any obligation under this Agreement, then the Lender may declare the principal amount owing and interest due under this Agreement at that time to be immediately due and payable.

5. If the Borrower defaults in payment as required under this Agreement or after demand for ten (10) days, the Security will be immediately provided to the Lender and the Lender is granted all rights of repossession as a secured party.

**Security**

6. This Loan is secured by the following security (the "Security"): Hawk and Hachette contracts subordinated to any outstanding bank loans.

7. The Borrower grants to the Lender a security interest in the Security until this Loan is paid in full. The Lender will be listed as a lender on the title of the Security whether or not the Lender elects to perfect the security interest in the Security.

**Governing Law**

8. This Agreement will be construed in accordance with and governed by the laws of the State of California.

**Costs**

9. All costs, expenses and expenditures including, without limitation, the complete legal costs incurred by enforcing this Agreement as a result of any default by the Borrower, will be added to the principal then outstanding and will immediately be paid by the Borrower.

**Assignment**

10. This Agreement will pass to the benefit of and be binding upon the respective heirs, executors, administrators, successors and assigns of the Borrower. The Borrower waives presentment for payment, notice of non-payment, protest, and notice of protest.

**Amendments**

11. This Agreement may only be amended or modified by a written instrument executed by both the Borrower and the Lender.

**Severability**

12. The clauses and paragraphs contained in this Agreement are intended to be read and construed independently of each other. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the

provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

**General Provisions**

13. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**Entire Agreement**

14. This Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise.

**IN WITNESS WHEREOF**, the parties have duly affixed their signatures under hand and seal on this 31st day of March, 2007.

**SIGNED, SEALED, AND DELIVERED**
this 31st day of March, 2007.

Paul Shechet (Amount--$75,000)

Stephen Y. Ascher, Jr.
(Amount--$50,000)

Stephen Y. Ascher Sr.
(Amount--$25,000)

**SIGNED, SEALED, AND DELIVERED**
this 31st day of March, 2007.

Icon Brands Group, Inc.
Stephen Y. Ascher, Jr. President

## PROOF OF SERVICE

I am employed in Los Angeles County.  I am over the age of 18 and not a party to this action.  My business address is 1055 West Seventh Street, 24th Floor, Los Angeles, California 90017.

On July 16, 2012, I served the foregoing document, described as **"FIRST AMENDED COMPLAINT"** in this action by placing

☐ the original of the document     ☒ true copies of the document

in separate sealed envelopes to the following addresses:

AAA Sandra Marshall SandraMarshall@adr.org

eglui@aol.com

Henry Silberberg henry@silberbergresolution.com

'Jay McCauley' info@mccauleylaw.com

John Lee johnlee@quinnemanuel.com

Richard McDonald rmcdonald@horganrosen.com

Steve Madison stevemadison@quinnemanuel.com

☒ **BY E-MAIL**   I caused the above-referenced document to be transmitted via e-mail to the parties as listed above.

☒ **STATE**  I declare under penalty of perjury under the laws of the state of California, that the above is true and correct.

Executed on July 16, 2012, at Los Angeles, California.

_____
**Ada Garcia**